# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 19, 2011 Session

## STATE OF TENNESSEE v. ROBERT L. ADAMS

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-61909B     David Bragg, Judge**

_____

**No. M2010-00916-CCA-R3-CD - Filed November 8, 2011**

_____

The defendant, Robert Lee Adams, fled justice while the jury was deliberating numerous charges against him stemming from his participation in a drug-related shooting in 2007. The jury found the defendant guilty of attempted first degree murder, a Class A felony; especially aggravated kidnapping, a Class A felony; aggravated robbery, a Class B felony; and conspiracy to commit kidnapping, a Class D felony. The defendant was sentenced *in absentia* to an effective sentence of life without the possibility of parole plus twenty years. The defendant's trial counsel filed a timely motion for new trial. In response, the State moved to dismiss the defendant's motion on the grounds that the defendant had abandoned his right to proceed by absconding from the court's jurisdiction. After a hearing held while the defendant was still *in absentia*, the trial court dismissed the defendant's motion for a new trial pursuant to the fugitive disentitlement doctrine and allowed the defendant's trial counsel to withdraw soon thereafter. Weeks later, the defendant was returned to custody, filed a *pro se* notice of appeal, and was appointed new counsel. On appeal, the defendant argues that: (1) the trial court erred by dismissing his motion for a new trial; (2) the evidence was insufficient to support his convictions; (3) the trial court erred by denying his trial counsel's motion for a continuance; and (4) the trial court applied improper enhancement factors when it sentenced him for his conspiracy and aggravated robbery convictions. The State argues that we must dismiss the defendant's appeal for lack of jurisdiction. We conclude that the trial court properly dismissed the defendant's motion for a new trial on the grounds that he was a fugitive from justice but that, nonetheless, we have jurisdiction to review his appeal now that he has been returned to custody. The absence of a motion for new trial, however, limits our appellate review to considering the sufficiency of the evidence to support his convictions and his sentencing. After thorough review, we conclude that sufficient evidence supports the defendant's convictions and that the trial court committed no error in sentencing the defendant for conspiracy to commit kidnapping. While we conclude that the trial court may have erroneously applied one of the several enhancement factors it used when it sentenced the defendant for aggravated robbery, in light of the applicable sentencing principles, remaining enhancement factors, and the particular facts of this case, we conclude

that the sentence imposed by the trial judge was appropriate. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

T. E. "Ned" Williams, III, Franklin, Tennessee (on appeal), and Kirk D. Catron, Murfreesboro, Tennessee (at trial), for the appellant, Robert L. Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Senior Counsel; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The victim in this case, Ms. Darice Brown, was shot numerous times and left for dead near an abandoned construction site during the late evening hours of December 15, 2007, after she arranged a drug transaction on the defendant's behalf. The defendant and three co-defendants were indicted on August 6, 2008, by the Rutherford County Grand Jury on four counts: attempted first degree murder in violation of Tennessee Code Annotated section 39-13-202, a Class A felony; especially aggravated kidnapping in violation of Tennessee Code Annotated section 39-13-305, a Class A felony; especially aggravated robbery in violation of Tennessee Code Annotated section 39-13-403, a Class A felony; and conspiracy to commit kidnapping in violation of Tennessee Code Annotated section 39-12-103, a Class D felony. At the defendant's trial on December 16-17, 2009, the victim took the stand and as testified to the following:

On December 15, 2007, the defendant, whom she knew as "P.T.," called her several times to request that she find him some cocaine. The victim was aware of an individual, whom she knew as "B.I.," who lived in Murfreesboro and dealt in cocaine, from some prior dealings with her cousin. Although she had not previously dealt with B.I., the victim called B.I. on the defendant's behalf and arranged to purchase some cocaine. B.I. told the victim to meet him at the local Walmart. The victim passed along the location of the transaction to the defendant.

The defendant arrived at the victim's house in a car that also contained a large black man and two white women. The victim had previously met one of the white women, Kristi Ray (known to her as Michelle), through her cousin. The victim had also met the large black

man, Bryant Overton (known to the victim under his alias "Debo"), on one occasion at the defendant's house. The remaining white woman, Kesha Adams (the defendant's wife), was a stranger to the victim and was introduced to her as "Cash."

The victim initially refused to get into the vehicle with the defendant and the others, explaining that she was uncomfortable traveling to Walmart accompanied by so many people. However, the defendant assured her that "nobody's not going to do anything to you," and the victim eventually got into the back seat of car, with the defendant sitting on one side of her and Debo on the other.

When they arrived at the Walmart, the defendant, Debo, and the victim got out of the car. The defendant and Debo stood against a wall while the victim went into the store and had a conversation with B.I. B.I. inquired as to whom was with the victim, and when the victim informed him, he refused to complete the deal. The victim exited the Walmart, and the defendant and Debo followed her back to their car.

The defendant insisted that the victim continue to press B.I. to complete the deal. The defendant told her to call B.I. back and inform him that "nothing was going to go wrong" and that the defendant would send in his wife, Cash, along with the victim to complete the deal. B.I. agreed, and the victim and Cash reentered the Walmart and exited from the other side, where they met B.I. in the parking lot. Cash gave B.I. money in return for what appeared to be cocaine. The two women then returned to the car.

The victim was again seated in the backseat of the vehicle between Debo and the defendant. Debo suddenly exclaimed, "I know him [B.I.] from somewhere." Debo went on to indicate that he "had a beef with [B.I.]." According to the victim's testimony, Cash then informed the group that B.I. used to hang out with another unnamed individual, with whom Cash and Debo were having a dispute. Immediately upon learning this, Debo asked the defendant to give him a gun. The defendant passed a gun to Debo in front of the victim. The victim immediately became frightened, as up until that point she had been unaware that there was a gun in the car. The victim immediately told the defendant and Debo, "I don't know what this is about, but if you have a problem with [B.I.,] he's two parking spots over."

Rather than follow up on the victim's implicit suggestion, Debo held the gun in his lap while the defendant instructed the victim to call B.I. and attempt to lure him to a nearby Baskin-Robbins. B.I. did not answer his phone. The car's driver, Michelle, volunteered that she thought she knew where B.I. lived. She proceeded to drive the group around the Murfreesboro area for about 30 to 45 minutes, ostensibly in search of B.I.'s house. The victim remained continuously trapped between Debo and the defendant in the back seat of the car throughout the entire trip. All of the car's occupants remained very quiet except for

Debo, who kept accusing the victim of lying and of knowing B.I.'s whereabouts.

At some point during their vain attempt to locate B.I.'s residence, the defendant tried some of the cocaine that Cash had purchased and announced that the narcotic at issue was dissatisfactory. The defendant then handed the cocaine to Cash, who also tried some and concurred in his assessment. Upon hearing this, Debo announced, "I know exactly where we're going to go." Debo then began giving Michelle meticulous instructions as to where to drive the vehicle. The victim looked to the defendant for some sign of solace, but the defendant simply lowered his head and stated "somebody's going to die tonight."

After witnessing these events, the victim panicked. She offered the group money and begged for them not to shoot her. She hid her cell phone between her legs and surreptitiously tried to call for help. However, Debo detected these efforts and took her phone away from her. The car continued along various back roads in the dark for some distance, until the victim could not see any more houses. Then Debo told Michelle to stop the car and then to back the vehicle up. Debo exited one side of the vehicle and told the victim to get out as well. When she failed to move, he grabbed her and pulled her out. While still holding the gun, he took her purse and jacket.

After she had been taken out of the car and deprived of her personal belongings, the victim heard the gun go off and felt herself being shot in the leg. She fell over and tried to play dead. As the victim did her best to hold herself both completely still and absolutely quiet, Debo shot her repeatedly. Finally, the victim heard a click emanate from the gun, indicating to her that its last bullet had been fired. The victim testified that she had been frozen staring at Debo's feet throughout the entire ordeal and that she saw Debo re-enter the vehicle afterward. Then she heard someone yell "go" and the car sped off – coming so near to hitting her in the process that she could feel the gravel kicked up by its tires landing on her bleeding body as the vehicle bolted away.

For some time afterward, the victim lay in the dark and prayed. After a time, she realized that she could hear traffic but knew that she was nowhere near a road. The victim testified that although her legs were no longer working, she managed to crawl on her elbows through the mud until she reached the highway. Once there, she crawled into the middle of the pavement and collapsed across the yellow lines in the center of the thoroughfare. Soon thereafter, she heard a car approach and attempted to signal it with her arms. The car came perilously near to her body before stopping. A man and a woman got out of the vehicle, and she heard them call the police and an ambulance.

The victim testified that she was life-flown to Vanderbilt Hospital and was treated there for several weeks. She had liver damage and a fractured pelvis. She underwent

operations to place screws in her left knee, to place a rod from her hip down to her knee, and to reverse a colostomy. The victim was required to wear a colostomy bag for many months. She also had numerous surgeries to remove hernias and scar tissue. The victim testified that at the present time, she was still undergoing physical and mental therapy as a result of the incident and had been unable to return to work.

Before leaving the stand, the victim discussed her prior criminal record, which included a conviction for conspiracy to sell drugs. The victim also identified the defendant, Robert Adams, as the person who had accompanied Debo on the night that she was shot and as the person to whom she had referred to variously as "P.T." and "Tracy" during the ensuing investigation and court proceedings. The victim stated that she had never recovered either her cell phone or her purse after the night that she was shot.

Following the victim's testimony, the State presented the testimony of Officer Ty Downing of the Rutherford County Sheriff's Department, who responded to a call on Beasley Road the night of December 16, 2007, concerning a female that had been found in the middle of the roadway and had been shot multiple times. Officer Downing testified that upon his arrival, the victim had already been transported from the scene by medical personnel. Officer Downing was informed on the scene that the victim had told other officers that, prior to being shot, she was in the company of two black males named "P.T." and "Debo" and two white females named "Cash" and "Michelle," and that they were driving a green car. He was further informed that the shooting was related to a drug deal and that the victim had been shot by a man named Debo. Officer Downing testified that he interviewed the individuals who had found the victim in the road: Alissa Phillips, Ryan Trotter, and Stevie Trotter. In addition, Officer Downing secured and processed the crime scene, which was near a construction site. During this process, Officer Downing testified that he recovered five .380 caliber shell casings from the scene, as well as a woman's purse containing no money.

Later that same day, Officer Downing testified that he contacted the victim at Vanderbilt Hospital. Although the victim was unable to talk, she was able to write down answers to certain questions on a notepad. The victim identified "Debo" and the defendant (under his alias "Tracy") as her shooters. Officer Downing prepared two separate photo lineups, one containing the defendant Robert Adams' photo and one containing Kesha Adams' photo. The officer testified that the victim identified the defendant Robert Adams as "P. T." and Kesha Adams as "Cash." Soon afterward, Officer Downing testified that he called the defendant and spoke with him briefly by phone. Together, they scheduled an appointment for the defendant to come in for questioning. When the defendant failed to keep that appointment, Officer Downing obtained a warrant for his arrest.

Following his arrest, the defendant was given his *Miranda* warnings, after which he

consented to give a videotaped statement to police. In that statement, the defendant admitted to being one of the people in the car with the victim on the night that she was shot and admitted that he had gotten out of the car in order to let the victim out before Debo shot her. After giving this testimony concerning the defendant's police interview, Officer Downing authenticated a number of photographs of the crime scene and identified the defendant as Robert Adams, also known as "P.T." and "Tracy."

Next, the State presented the testimony of Ms. Stevie Trotter, Mr. Ryan Trotter, Mr. Michael Glossup, and Ms. Alissa Phillips, who generally testified that they were all returning home from a Christmas party around midnight when they discovered the victim lying in the middle of the road. They testified that they initially thought that some trash had blown into the road, until the victim raised up her hand in an attempt to flag them down. They testified that they quickly swerved their vehicle and barely avoided hitting her. They further testified that the victim was shivering with cold and was having difficulty speaking when they found her but that she did manage to inform one of them that someone named "Debo" had shot her.

Thereafter, the State presented the testimony of Officer Philip Martin of the Rutherford County Sheriff's Department, who testified that he photographed the crime scene on the night in question and secured certain evidence, including pieces of the victim's clothing. These were later admitted into evidence. On cross-examination, Officer Martin testified that no gun was ever recovered from the crime scene and that no fingerprints were found on any of the shell casings that were found that night.

The State's next witness was Officer Duane Jackson of the Rutherford County Sheriff's Department, who testified that he assisted Officer Downing in the investigation and participated in a number of witness interviews. Officer Jackson confirmed that the victim identified the defendant from a photo lineup soon after the shooting. Officer Jackson also confirmed that after having been given his *Miranda* warnings the defendant told detectives a number of different stories concerning the events on the night of the shooting – but that he admitted to being in the vehicle with the victim on the night that she had been shot. Officer Martin testified that in the defendant's final version of the events, the defendant maintained that he had dropped off Debo and the victim at the construction site and that as he was driving off, he heard shots being fired. He then returned to pick up Debo alone. Officer Jackson identified a digital video disk (DVD) containing the defendant's recorded police interview, and this DVD was entered in the evidence.

Finally, the State presented the testimony of Dr. Richard Miller, the medical director of the trauma unit at Vanderbilt University Medical Center, who gave extensive testimony concerning the wounds suffered by the victim on the night in question. Dr. Miller testified that the victim underwent numerous operations, developed multiple complications, and

would probably suffer from permanent disabilities from her injuries. Dr. Miller also testified that, in his expert opinion, the victim would have died had she not received timely medical treatment. Following this testimony, the State rested.

The defense promptly moved for a judgment of acquittal on the grounds that there was insufficient evidence that the defendant, as opposed to Debo, had attempted to kill the victim, kept her in the vehicle against her will, or deprived her of her property. After the court denied this motion, the defendant was advised of and waived his right to testify in his own defense pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999).

Following the usual *Momon* soliloquy, the defendant's trial counsel made an oral motion for a continuance on the unusual grounds that "at [one] a.m. this morning I received a phone call from my client who left me a message about a witness we just learned about. He's not listed in the court documents or anything like that," and "we'd ask you for an opportunity to subpoena this gentleman to get him here to testify." The trial court held a brief hearing and took testimony from the defendant concerning this alleged witness, who was supposedly named "Jeremy Jenkins." According to the defendant, "Mr. Jenkins" had been reluctant to come forward previously because he was married and was having an affair with the victim. According to the defendant, "Mr. Jenkins" had called him the night before and had promised him that he would testify in the defendant's defense. The defendant claimed that "Mr. Jenkins" would testify that the victim had stated to him during their affair that "she knew that I didn't have anything to do with this . . . [a]nd the only reason that she was upset with me is because I did not stop it." On cross-examination, the defendant testified that "Mr. Jenkins" would not come to court without receiving a subpoena, that he did not know the location where "Mr. Jenkins" worked, that "Mr. Jenkins" refilled snack machines for a living, and that "Mr. Jenkins" was not allowed to bring a phone with him into the building where he worked.

After hearing this testimony, the trial judge stated that the issue of this surprise witness should have been brought to his attention earlier in the morning. Nonetheless, the trial court granted the defense a two-hour continuance in order to afford the defendant the opportunity to secure this alleged witness. When this continuance had expired, the defendant's trial attorney rested his case, and both sides made their closing arguments. The court instructed the jury, and the jury retired. At some point after receiving the continuance and while the jury was deliberating, the defendant, who was out on bond during the trial, absconded from the building and fled the area.

The jury returned after deliberating and found the defendant guilty of attempted first degree murder, a Class A felony; especially aggravated kidnapping, a Class A felony;

aggravated robbery, a Class B felony; and conspiracy to commit kidnapping, a Class D felony. After the verdict was announced, the trial judge queried the defendant's trial counsel concerning the defendant's whereabouts, and the defendant's counsel informed the court that the defendant had sent him a text message claiming that he was on his way to the hospital. The defendant's trial counsel suggested that the defendant may have intended to visit a brother there who allegedly suffered from multiple sclerosis.

The record reveals that the defendant remained at large for many weeks. On February 12, 2010, a sentencing hearing was held while the defendant was still *in absentia*. At this hearing, the trial court heard testimony from Ms. Candace Whizman, the director of Management Services at the Tennessee Department of Correction, who testified that she had compared the department records of the defendant Robert Adams with an individual known as Tracy Greer and, based on a comparison of their photographs and their matching date of birth, concluded that they were the same individual. She further testified that the defendant, under the name Tracy Greer, had a criminal record including a conviction for second degree murder. The department records under both names were entered into evidence.

The State also presented the testimony of Agent Suzann Lafferty of the Tennessee Bureau of Investigation, who testified that she was a forensic scientist specializing in fingerprints. Agent Lafferty testified that she had conducted a fingerprint analysis of Mr. Tracy Greer and the defendant Robert Adams and determined that the two sets of fingerprints matched. A report summarizing her finding was entered into evidence. Finally, the State presented the testimony of Merilynn Raney, a presentence investigator for the Tennessee Board of Probation and Parole. Ms. Raney testified that she had investigated and determined that the defendant had an alias, Tracy Greer, and that he had an alternate social security number associated with that alias. She testified that she had prepared a presentence report for the defendant including information pertaining to his alias, and this report was entered into evidence.

Following this testimony, the trial court found that the defendant Robert Adams and Tracy Greer were the same individual. Based on the defendant's criminal history, the trial court applied Tennessee's three strikes law, Tennessee Code Annotated section 40-35-120, and found beyond a reasonable doubt that the defendant was a repeat violent offender – thereby sentencing him to mandatory sentences of life without the possibility of parole for the attempted first degree murder conviction and the especially aggravated kidnapping conviction, with these sentences to be served concurrently.

In addition, the court sentenced the defendant as a Range II, multiple offender on the two remaining counts, finding as enhancing factors that the defendant had a previous history of criminal convictions and behavior above that necessary to establish his range; the

defendant was the leader in the commission of an offense involving two or more actors; the defendant allowed the victim to be treated with exceptional cruelty; the damage to the victim was particularly great; the defendant employed a firearm during the commission of the offense; and the defendant had no hesitation about committing a crime where the risk to human life was high. The trial court found no mitigating factors. After duly considering and weighing these factors, the court sentenced the defendant to twenty years to be served at thirty-five percent for the aggravated robbery and to eight years to be served at thirty-five percent for the conspiracy to commit kidnapping, with these two sentences to be served concurrently. However, because the trial court found that the defendant was a career criminal, a dangerous offender, and an offender whose record of criminal activity was extensive, the trial court ordered the latter two concurrent sentences to be served consecutively to his concurrent sentences of life without the possibility of parole.

On March 2, 2010, the defendant's trial counsel filed a timely motion for a new trial. On March 12, 2010, the trial court held a hearing on that motion. The State moved to dismiss the motion on the grounds that the defendant was a fugitive from justice. The trial court ruled that the defendant had waived his opportunity to present a motion for new trial and dismissed the motion; a written order to that effect was signed by the trial judge on March 22, 2010, and stamped as filed by the clerk on March 23, 2010.

Also on March 12, 2010, the defendant's trial counsel moved to withdraw from representation on the grounds that the defendant had made himself unavailable to assist in his own defense. This motion was granted on March 24, 2010.

On April 15, 2010, under circumstances that do not appear in the record, the defendant was returned to the custody of the State. The defendant, acting *pro se*, filed a notice of appeal, and what appears to be the original copy of that notice has been included in the record. The seemingly-original copy bears a color-ink "filed" date stamp reflecting that it was filed with the deputy clerk on April 21, 2010 – meaning that the notice appeal was filed within thirty days following the filing of the trial court's written order dismissing the defendant's motion for a new trial, and was therefore timely under Rule 4(a) of the Tennessee Rules of Appellate Procedure.[1] This court appointed new counsel to represent the

---

[1]  Whether the defendant filed a timely notice of appeal has become a matter of considerable confusion to the parties and this court. The defendant's appellate counsel filed a "Motion for Waiver of Untimely Notice of Appeal" on December 28, 2010, which was granted by this court on January 18, 2011. Following this motion, both sides appear to have proceeded under the erroneous assumption that the defendant's notice of appeal was untimely. The State's brief on appeal states in its Statement of the Case that the defendant's notice of appeal was untimely, and both sides state in their briefs that it was filed on April 22, 2010. In addition, the actual text of the defendant's notice of appeal states that he was intending

(continued...)

defendant on September 28, 2010, and granted multiple extensions of time to the parties in which to file their briefs. Oral argument concerning this matter occurred on July 11, 2011, in Nashville before a panel of this court. Our decision follows.

## I.

The defendant's first claim is that the trial court erred in dismissing his motion for a new trial on the grounds that he was a fugitive from justice. The defendant's claim of error is based on his assertions that (1) the Tennessee Supreme Court's decision establishing the fugitive disentitlement doctrine, *Bradford v. State*, 202 S.W.2d 647, 648-49 (1947), should not be applied on the facts of this case and was, in essence, wrongly decided, and (2) there is no evidence in the record that the defendant's absence from the trial court's hearing on his motion for a new trial was voluntary. We conclude that the defendant's motion for a new trial was properly dismissed because the defendant remained a fugitive from justice while his motion was pending in the trial court.

The State argues that in light of the fact that the defendant's motion for a new trial was properly dismissed, this court lacks jurisdiction to review the defendant's appeal. We conclude that we have jurisdiction to review this particular defendant's appeal for limited purposes, as explained more fully below.

## A.

With respect to the defendant's first argument – that *Bradford* should not be applied because its rationale is inapplicable to the facts of this case and because the defendant's trial counsel stood ready, willing, and able to pursue the defendant's motion for a new trial on his behalf – the picayune distinctions drawn by the defendant between the facts of his situation

---

[1](...continued)
to notify the courts of his intent to appeal on April 22, 2010. Finally, a photocopy of the defendant's notice of appeal, attached to Volume III of the technical record of this case, bears an image of a date stamp from the deputy clerk that appears to have been altered with a felt-tip pen. The date on the copy of that notice, as altered, is April 22, 2010. The confusion appearing in the record concerning the date on which the defendant's notice of appeal was filed and the date on which his motion for new trial was denied is especially unfortunate in light of the fact that the timeliness of the defendant's notice of appeal in this case is a matter of crucial importance to the proper resolution of the applicability of the fugitive disentitlement doctrine, one of key legal issues raised in the appeal. However, our comparison of the "filed" date stamp on what appears to be the defendant's original notice of appeal with the "filed" date stamped on the copy of the trial court's order dismissing the defendant's motion for new trial included in the record leads us to the conclusion that the defendant's notice of appeal was filed in a timely fashion; any confusion over this issue should not inure to the detriment of the defendant.

and the facts confronting the court in *Bradford* render his argument tantamount to a plea that *Bradford* was wrongly decided and should be overturned. This court is without power to overrule the Tennessee Supreme Court's *Bradford* decision, which held that "a defendant who escapes and becomes a fugitive from justice while his motion for a new trial is pending" has "by his own act . . . waived the right to have his motion for a new trial considered and determined." *Id.* at 648. The "fugitive disentitlement doctrine," as this principle has become known, is "long-established in the federal and state courts, trial and appellate," and has recently been reaffirmed by our supreme court. *Searle v. Juvenile Court for Williamson County*, 188 S.W.3d 547, 550 (Tenn. 2006). Legally, this court cannot accept the defendant's invitation to alter or amend the fugitive disentitlement doctrine as expounded by our supreme court.

Nor would we be inclined to dispense with such an important bedrock doctrine of law even had we the authority to do so. As the *Bradford* court eloquently reasoned, "the proceedings [concerning a motion for new trial] are commenced and prosecuted by the defendant," not the State, and consequently the defendant's act of fleeing the jurisdiction "[i]s in legal effect an abandonment of the prosecution of his motion." *Bradford*, 202 S.W.2d at 647-49. Moreover, if an absconded defendant's motion for new trial is denied, he "cannot be made to respond to any judgment which may be rendered," and any "order and judgment based thereon may never be enforced because the defendant by escaping has placed himself beyond the control of the court." *Id.* at 648. As a matter of policy, courts should not "give their time to proceedings which, for their effectiveness, must depend upon the consent of an escaped convict." *Id.* at 648. All of this reasoning applies with full force to the facts presented by the case at bar.

We fundamentally agree that the fugitive disentitlement doctrine "is sound public policy to discourage the absence and flight of those individuals who disagree with court orders and judgments but still seek [judicial] relief." *Searle*, 188 S.W.3d at 551. As *Searle* indicates, it is contrary to public policy to allow a fugitive from justice to be placed in a better legal position than a defendant who has continuously submitted to judicial authority, by affording the former the privilege of taking advantage of any favorable ruling while avoiding all consequences of any adverse one. Given that this defendant chose to evade the trial court's power while his motion for new trial was pending, the trial court did not err in dismissing his motion.

B.

Nor did the trial court err by finding that the defendant was voluntarily absent from his hearing on his motion for a new trial. In its order dismissing the defendant's motion, the trial court found that "the defendant left the jurisdiction by his own actions" and "has not

-11-

been located since his trial." This conclusion is amply supported by the record evidence, which reflects that the defendant was absent from the conclusion of his trial, his sentencing hearing, and the hearing on his motion for a new trial. Presiding over the proceedings at issue, the trial court was free to take judicial notice of the defendant's absence. Tenn. R. Evid. 201 (2007).

Once a defendant's absence from the relevant court proceedings has been established, the defendant, to avoid application of the fugitive disentitlement doctrine, is obliged to establish that his absence was involuntary. In this sense, application of the fugitive disentitlement doctrine can be compared to the crime of failing to appear in court, *see* T.C.A. § 39-16-609 (2011), in that once it has been established that a defendant has failed to appear in court on the required date, the defendant bears the burden of establishing that there was a reasonable excuse for his absence (*viz.*, that his absence from court was involuntary).

In this case, the record fully establishes that the defendant was not in court and that he did not attend his hearing on the relevant date. The defendant made no attempt in the court below and has made no attempt on appeal to advance any theory under which his absence could be deemed involuntary – much less directed us toward any record evidence that might support such a theory. Under these circumstances, the trial court committed no error in finding that the defendant was voluntarily absent from the proceedings.

C.

In light of our rejection of the defendant's arguments as described above, the State argues the consequence should be the dismissal of the defendant's appeal. Because the defendant's motion for a new trial was dismissed, rather than denied, the State claims that the defendant does not have the right to appeal the order under Rule 3 of the Rules of Appellate Procedure, and therefore this court is without power to hear the appeal. The State quotes the Tennessee Supreme Court's decision in *Byington* in support of this position: "Rule 4 dictates that after the defendant filed his motion for new trial, the Court of Criminal Appeals did not have jurisdiction to hear the defendant's appeal until the trial court entered an order *denying* the motion for new trial." *State v. Byington* 284 S.W.3d 220, 225 (Tenn. 2009) (emphasis supplied). Because the trial court entered an order dismissing – not denying – the defendant's motion as abandoned, the State urges that *Byington* precludes our exercise of jurisdiction.

The plain implication to be drawn from the State's argument is that any order by a trial court dismissing a motion for new trial is essentially insulated from **ordinary** review by this court. In reaching this conclusion, the State misapprehends the language it has quoted from *Byington*. The *Byington* court was deciding an entirely unrelated issue: whether minute

entries would satisfy the requirement that there be an "entry of [an] order denying a new trial" for purposes of commencing the thirty-day deadline for filing a notice of appeal pursuant to Tennessee Rule of Appellate Procedure 4, or whether a separate written order denying the motion was required. *See Byington*, 284 S.W.3d at 224-25. In other words, the issue was "what action a trial court must take to demonstrate that the trial court has denied a motion for new trial." *Id.* at 224. The jurisdictional quandary facing the appellate court was whether the trial court had finally disposed of a timely motion for new trial. In this case, the record reflects that the trial court disposed of the defendant's motion for a new trial by entering a written order dismissing the motion on March 23, 2010. There is no issue as to whether the lower court has entered an order disposing of the defendant's motion; the trial court's final decision has been amply evidenced.

Although *Byington* speaks in terms of an order denying, rather than dismissing, a motion for new trial, the mere fact that a motion for new trial was dismissed rather than denied in the trial court has not been held to bar to this court's jurisdiction. *See, e.g., State v. Wayne Miller*, No. W2005-00678-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1281, at **9-10 (Tenn. Crim. App. Dec. 16, 2005). What matters for jurisdictional purposes under Tennessee Rule of Appellate Procedure 4 is whether there is still a pending motion for new trial in the trial court, *i.e.,* whether the trial court retains jurisdiction over the case. This court may not assume appellate jurisdiction over a case pursuant to that rule while jurisdiction properly remains in the court below, meaning that either (1) no final judgment has been entered or (2) any pending motion listed in Rule 4(c), such as a motion for new trial, has not been disposed of with finality. *See Hutchison v. ARO Corp.*, 653 S.W.2d 738, 740 (Tenn. Ct. App. 1983) (holding this court lacks jurisdiction to review an appeal "filed prior to the disposition of [a] motion for a new trial" because "[t]here has been no final disposition below"). In this case, the record is clear that there is no pending motion for a new trial in the lower court. Consequently, this court has the power to assume appellate jurisdiction consistent with the Tennessee Rules of Appellate Procedure.

Nor is this court required to dismiss the defendant's appeal itself under the fugitive disentitlement doctrine. While it is established that a defendant "waive[s] his right to pursue a direct appeal from his convictions and sentences [if] he escaped and remained on escape status during the time in which a direct appeal should have been pursued," *see Curtis v. State*, 909 S.W.2d 465, 468 (Tenn. Crim. App. 1995), we have determined that this defendant was returned to justice and filed a timely notice of appeal prior to the expiry of the time permitted by Tennessee Rule of Appellate Procedure 4. Precedent establishes that if a defendant perfects an appeal, temporarily escapes, but is returned to custody by the time of the appeal's consideration, his appeal should not be dismissed. *See Knight v. State*, 229 S.W.2d 501, 501 (1950). The present defendant's situation – escaping, but returning in time to perfect his appeal and remaining in custody thereafter, is analytically similar: "the defendant is in

custody and the judgment of the Court can be enforced." *Id.* Consequently, while *Searle*, *Bradford*, and *Curtis* would dictate dismissal of the defendant's appeal if he had remained a fugitive (1) past the deadline for filing a notice of appeal or (2) at the time of his appeal's consideration; this defendant was returned to custody in time to file a timely notice of appeal, did so, and has remained in custody throughout the consideration of this appeal. Under these circumstances, this court will not dismiss his appeal pursuant to the fugitive disentitlement doctrine.

However, as *Searle* and *Bradford* indicate, a fugitive from justice who has been returned to state custody should not be placed in any better position than a defendant who has remained in consistent submission to the court's authority. Consequently, as the defendant's motion for a new trial was properly dismissed as abandoned in the court below, we will place the defendant in the same position as a defendant who has appealed after neglecting to file a motion for a new trial. Under these circumstances, it is well established that this court's review is limited to considering the sufficiency of the evidence to support his convictions and his sentences. *See, e.g., State v. Vaughn,* 279 S.W.3d 584, 593 (Tenn. Crim. App. 2008); *State v. Boxley*, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001); *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997).

All other claims are deemed waived pursuant to Rule 3(e) of the Tennessee Rules of Appellate Procedure, including, for purposes of this appeal, the defendant's claim that the trial court erred by denying his last-minute motion for an extended continuance to secure the testimony of "Mr. Jenkins." We decline to engage in plain error review of this claim under Rule 13(b) of the Tennessee Rules of Appellate Procedure on the grounds that such review is not necessary to prevent needless litigation, prejudice to the judicial process, or injury to public interest. The defendant raises no colorable claim that the trial court's failure to grant an extended continuance struck at the fairness or integrity of his judicial proceedings – a prerequisite that must be satisfied before this court will engage in plain error review in light of the defendant's waiver. *See, e.g. State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983).

II.

The defendant claims that the evidence was insufficient to support his conviction for conspiracy to commit kidnapping and that the State failed to establish by sufficient evidence that the defendant was criminally responsible for Debo's actions when he committed the attempted first degree murder, especially aggravated kidnapping, and aggravated robbery of the victim. These claims have no merit.

With respect to sufficiency of evidence challenges, a jury's guilty verdict strips a

-14-

defendant of the presumption of innocence and replaces it with a presumption of guilt. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Defendants must strive to overcome this presumption on appeal. *Id.* The defendant has not met this burden. The defendant generally claims, as he did at trial, that he did not do anything but try to arrange a drug transaction and sit in a car. He claims he should not be held responsible for the criminal actions that were committed by Debo and that Debo alone should be held responsible for the victim's kidnapping, robbery, and shooting. However, "[w]hen the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dorantes*, 331 S.W.3d at 379; *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In this case, a jury listened to the defendant's arguments and roundly rejected them. Record evidence amply supports the jury's conclusion.

The defendant first argues that the evidence was insufficient to support his conviction for conspiracy to commit kidnapping. Conspiracy "is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." T.C.A. § 39-12-103(a) (2007). The defendant claims that there is no evidence of any "concert of design" among the group on the night in question, and that there is also no evidence that the defendant was aware that the object of the group's conspiracy on the night in question was to kidnap the victim, rather than merely to obtain illegal drugs.

However, circumstantial evidence abounds in the record in support of the jury's conclusion that the defendant participated in a group conspiracy to kidnap the victim and that this conspiracy was separate and apart from any conspiracy to purchase illegal drugs. The victim's testimony, alone, to the effect that the defendant (1) urged her to get into a vehicle occupied by the group to facilitate a drug transaction, (2) handed a weapon to Debo after that drug transaction had been completed, (3) stated after sampling the drugs – well after the completion of the drug transaction – that "somebody's gonna die tonight," (4) remained quiet in the car, with his body in a position blocking the victim's only means of egress, as Debo directed the group to a remote location, and (5) sped off in the car with the group after someone yelled "go" following the shooting fully suffices to support the jury's determination that the defendant was part of a group agreement whose purpose was to kidnap the victim and that this conspiracy was separate and apart from any uncharged conspiracy to purchase illegal drugs.

Next, the defendant argues that the evidence was insufficient to establish that he was criminally responsible for the crimes committed by Debo. An individual may be found guilty

of crimes committed by another "if the offense is committed by . . . the conduct of another for which the person is criminally responsible." T.C.A. § 39-11-401. An individual is criminally responsible for the conduct of another when "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . ." T.C.A. § 39-11-402(2). The evidence adduced at trial suffices to support the jury's conclusion that the defendant was criminally responsible for Debo's conduct when Debo committed the especially aggravated kidnapping, aggravated robbery, and attempted murder of the victim.

Concerning the defendant's criminal responsibility for Debo's commission of the especially aggravated kidnapping, the victim's testimony establishes that the defendant brought a firearm with him to the victim's house; enticed the victim into a vehicle; blocked the victim's means of egress from one side of the vehicle while she was driven around town, and ultimately to the construction site, against her will; and handed Debo the firearm which was used to intimidate the victim. The defendant's tape-recorded interview with police further reveals that he exited the vehicle in order to allow Debo to remove the victim from the car prior to shooting her. This evidence was more than sufficient for a reasonable jury to conclude that the defendant intended to assist, and in fact assisted, in the especially aggravated kidnapping of the victim.

Concerning the attempted first degree murder, in addition to the evidence discussed above, the victim testified that prior to being driven to the location where she was shot, the defendant stated that "somebody's gonna die tonight." Given the fact that he had previously supplied Debo with a weapon and in light of the victim's testimony concerning the events that followed, a reasonable jury was free to conclude that the defendant directed, or at least assisted, in Debo's attempt to murder the victim and that he fully intended to do so.

Concerning the aggravated robbery, the victim testified that the defendant was upset after discovering that he had purchased bad cocaine and spent considerable time in hushed discussions with his wife, Cash, after discovering the drugs were unsatisfactory. The victim testified that the defendant kept her trapped in the car next to Debo and that he permitted Debo to take her cell phone while she was being driven to a remote location. Once there, he permitted Debo to remove her purse and jacket, and drove away with him following her shooting. Investigating officers testified that neither the money from the victim's purse nor her cell phone were ever recovered. This testimony, combined with the testimony discussed previously, supports a conclusion that the defendant intended to assist Debo in the aggravated robbery of the victim.

There are, admittedly, a modest number of conflicting inferences that a jury might

have drawn from all the evidence adduced at the defendant's trial. The defendant urges that he gave the gun to Debo not to assist with the crimes that followed, but as protection against some perceived danger posed by B.I. The defendant urges that he was merely sitting next to the victim in the car, and not "blocking" her means of egress from the vehicle, as she was being driven to the site of the shooting. The defendant argues that he failed to take any steps to prevent Debo's crimes because he was too frightened. The law is clear, however, that "'the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom.'" *Dorantes*, 331 S.W.3d at 379 (*quoting State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007)). Under no circumstances may an appellate court "substitute its inferences for those drawn by the trier of fact." *Id.* In this case, the jury simply drew different conclusions from the evidence than those advanced by the defendant. The defendant's challenges to the sufficiency of the evidence to support his convictions are therefore denied.

III.

The defendant makes several arguments concerning his sentencing. As a preliminary matter, the defendant argues that the trial court erred by conducting the sentencing hearing with the defendant remaining *in absentia*. We conclude that the record provides sufficient evidence to support the sentencing judge's conclusion that the defendant willfully waived his right to be present at his sentencing. The sentencing judge was permitted to take judicial notice of the defendant's absence from the sentencing proceedings. Tenn. Rule Evid. 201. Also, because the sentencing judge was present and sitting on the bench earlier when the defendant disappeared during his trial, he had the authority to take judicial notice of the circumstances surrounding that disappearance, including the statements made on the record on the defendant's behalf by the defendant's trial counsel. Under these circumstances, it was not necessary for the trial court to hold an evidentiary hearing or take any additional evidence or testimony before concluding that the defendant had willfully waived his right to be present at his sentencing.

The defendant does not challenge the trial court's imposition (pursuant to Tennessee's three strikes law, Tennessee Code Annotated section 40-35-120) of two concurrent sentences of life without the possibility of parole for his convictions of attempted first degree murder and especially aggravated kidnapping. The defendant argues that the trial court erred in applying various enhancement factors when it sentenced him to a consecutive twenty years for his aggravated robbery conviction, to be served concurrently with eight years for his conviction for conspiracy to commit kidnapping. The burden of demonstrating that a sentence is erroneous is placed upon the appealing party. *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). This court's review of a trial court's sentence is *de novo* with a presumption that the trial court's determinations are correct. *Id.* This presumption "'is

conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *Id.* at 344-45 (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails" and "'our review is simply *de novo*.'" *Id.* at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004) (italicization supplied)).

The defendant challenges three of the six enhancement factors applied by the trial court in his sentencing for both conspiracy and aggravated robbery: that the defendant was a leader of an offense involving two or more persons, *see* T.C.A. § 40-35-114(2); that the defendant allowed the victim to be treated with exceptional cruelty, *see* T.C.A. § 40-35-114(5); and that the defendant had no hesitation about committing a crime where the risk to human life was high, *see* T.C.A. § 40-35-114(10). We believe that the trial court properly applied all three of these three factors with respect to the defendant's conspiracy conviction, and two of these three factors with respect to the defendant's aggravated robbery conviction.

The trial judge properly applied section 40-35-114 enhancement factors (2) and (5) with respect to the sentences imposed for both convictions. The defendant's challenge concerning the application of these factors is based on his assertion that he was merely a passive participant in the conspiracy and robbery. However, the defendant had a full and fair opportunity to be heard at trial concerning his alleged lack of participation in these offenses, and the jury did not credit his story. Neither did the trial judge. The record is replete with evidence that would support a finding that the defendant was a leader with respect to these offenses, including the victim's testimony that he (1) instigated the drug deal, (2) secured the victim's participation, (3) enticed the victim to get into a vehicle containing a group of four individuals who later worked together throughout the evening to commit the criminal acts at issue, (4) was the one in original possession of the firearm used to commit several of the offenses, and (5) passed the firearm used to commit the kidnapping, robbery, and attempted murder to his co-conspirator Debo. The record is also replete with evidence that, as a leader of the offense, the defendant allowed the victim to be treated with exceptional cruelty – including the victim's testimony that after Debo had fired his initial shot and the victim had fallen to the ground, the defendant allowed him to continue to fire at her motionless body until he ran out of ammunition. Thereafter, the defendant either directed or permitted the group to drive off (narrowly avoiding the victim in the process), leaving the victim to bleed to death alone at night in cold weather. Under these circumstances, we conclude that the trial judge committed no error by finding that both enhancement factors (2) and (5) were present.

With respect to enhancement factor section 40-35-114(10) – that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high" – the

defendant argues that this factor should not apply because the only individual whose life was placed at risk by the defendant's crimes was the victim, and factor (10) should not be applied "when the only person subject to being injured is the victim." *State v. Makoka*, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994). However, this bright-line rule is no longer the governing law.

In *State v. Lavender*, 967 S.W.2d 803, 807 (Tenn. 1998), our supreme court established that application of enhancement factor (10), like other enhancement factors, must be considered on a case-by-case basis. Rejecting "a rule that automatically would preclude application of enhancement factor[] (10) . . . in every robbery case,"[2] the supreme court explained that a sentencing court should instead "consider the elements of the offense and the evidence adduced at the trial and sentencing hearing." *Id.* "If the facts which establish the elements of the offense charged also establish the enhancement factor, then the enhancement factor may not be used." *Id.* "A court must, therefore, look to the specific facts and circumstances surrounding a defendant's crime to determine whether a particular enhancement factor is applicable." *State v. Lewis*, 44 S.W.3d 501, 506 (Tenn. 2001).

Under this test, it is clear that the trial court did not err in applying enhancement factor (10) with respect to the defendant's conspiracy conviction. As we have discussed more fully during our consideration of the defendant's challenge to the sufficiency of the evidence, conspiracy is an inchoate crime whose primary element is the mere formation of an agreement between persons to commit a crime, accompanied by the requisite *mens rea*. *See generally* T.C.A. § 39-12-103. Considering the circumstances of this particular conspiracy, the facts necessary to establish the defendant's agreement to commit the kidnapping did not necessarily involve a high risk to this victim's life. It was not the defendant's act of agreeing with the group to drive the victim around the Murfreesboro area (and then on to a remote location), forcibly and against her will, which posed a high risk to the victim's life. It was the defendant's decision to permit the victim to be shot, and for that shooting to continue until all ammunition was exhausted, that substantially increased her risk of death. These facts are entirely separate and apart from those necessary to establish that the defendant agreed with one or more other persons to kidnap the victim. Consequently, it was not error for the trial judge to apply this enhancement factor to the defendant's conspiracy sentence.

The trial court's use of factor (10) to enhance the defendant's sentence for aggravated robbery poses a different situation. As discussed above, our Supreme Court held in *Lavender* that the applicability of enhancement factor (10) should be decided on a case-by-case basis, and may be applied to robbery convictions where the person injured was the victim so long

---

[2] All of this court's existing case law to the contrary was overruled. *See Lavender,* 967 S.W.2d at 807 n.4.

as the evidentiary facts used to establish the elements of the offense are not the same evidentiary facts used to establish the presence of factor (10). However, in *State v. Reid*, 91 S.W.3d 247, 288, 312 (2002), that same court affirmed a decision by this court stating that enhancement factor (10) may not be used to enhance sentences for especially aggravated robbery because having "no hesitation about committing a crime when the risk to human life was high" was an inherent element of that offense. The crime of aggravated robbery falls in between the extremes of robbery and especially aggravated robbery, and neither this court nor our supreme court has spoken definitively on the issue of whether enhancement factor (10) may be used to enhance a sentence for a conviction of aggravated robbery where the only life that was placed at risk was that of the victim.

The weight of the unpublished authority from this court on the issue appears to support the view that, as a bright-line rule, enhancement factor (10) should not be applied to aggravated robbery convictions where the only human life at risk was that of the victim, reasoning that "this factor is inherent in the crime of aggravated robbery." *State v. Deborah N. Cotter*, No. E2009-01849-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 115 at *18 (Tenn. Crim. App. Feb. 15, 2011). We need not, however, diverge further from the supreme court's instruction in *Lavender* and *Lewis* that the applicability of enhancement factor (10) should be determined on a case-by-case basis in order to resolve the case at bar. Whether enhancement factor (10) may be applied in some cases during sentencing for an aggravated robbery conviction when the only person whose life was placed at risk was the victim, the fundamental principle remains the same: "Enhancement factors are not intended to allow sentence adjustments based on the general nature of the offense." *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). Or as this court has explained, "in general, factor (10) applies only where the facts that establish that the defendant created a high risk to human life also demonstrate a greater culpability than that incident to the offense underlying the enhancement." *State v. Lance Sandifer*, No. M2008-02849-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 1075 *54 (Tenn. Crim. App. Dec. 21, 2010).

Examining the evidentiary facts of this particular case, we cannot determine with any degree of certainty whether the facts that establish the enhancement factor are separate from the facts that establish an element of the defendant's aggravated robbery conviction. Although this defendant was charged with especially aggravated robbery, the jury found him guilty only of the lesser included offense of aggravated robbery. A robbery is considered aggravated if "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "where the victim suffers serious bodily injury." T.C.A. § 39-13-402. On the facts of this case, we do not know which of these two elements the jury used to find the defendant guilty; evidence presented at trial would support a jury's finding in favor of either element. If the jury relied on either the defendant or Debo's display of a deadly weapon to establish the aggravated

robbery, then separate evidence would establish the elements of the offense and the trial judge's finding of enhancement factor (10), which was based on the fact that the victim was repeatedly shot. If, however, the jury found the defendant guilty based on the fact that the victim suffered serious bodily injury, then the same evidentiary facts – Debo's repeated shooting of the victim – would have established both an element of the crime and the application of the enhancement factor, and application of this factor not be permissible under *Lavender*. Consequently, on the facts of this case, we cannot be entirely sure that the trial judge's application of enhancement factor (10) was permissible.

Assuming that the trial court misapplied this enhancement factor, this court would, as a consequence, review the defendant's aggravated robbery sentence *de novo* with no presumption of correctness. *See Carter*, 254 S.W.3d at 345. However, after carefully reviewing the record and the findings of the trial court *de novo*, we do not believe that a remand to the trial court for re-sentencing is required, or that the defendant's twenty-year sentence should be reduced in any way. The trial court correctly found and applied numerous other enhancement factors when it set the defendant's sentence, and in light of those enhancement factors and the particular facts of this case, we believe that the twenty year sentence imposed for this aggravated robbery is fully consistent with the principles and purposes of sentencing as set forth in the Sentencing Act. *See id.*; T.C.A. 40-35-210(d).

Finally, the defendant argues that the sentences imposed by the trial court for conspiracy and aggravated robbery his convictions were "excessive" given his "passive participation" in the crimes. As discussed above, conducting a *de novo* review of the defendant's sentence for aggravated robbery with no presumption of correctness has led us to the conclusion that the twenty-year sentence imposed by the trial court was appropriate. With respect to the defendant's concurrent eight-year sentence for conspiracy, further review leads us to conclude that the trial court considered all of the appropriate principles and laws in setting this sentence and that this sentence was not "excessive." Any weighing of applicable mitigating and enhancing factors rests within the discretion of the trial court. *See Carter*, 254 S.W.3d at 345. Trial courts are free to select any sentence within the applicable range so long as the length of the sentence is "'consistent with the purposes and principles of the Sentencing Act.'" *Id.* at 343 (*quoting* T.C.A. § 40-35-210(d)). There is no dispute that the sentence at issue was within the applicable legal range in light of the defendant's offenses and his offender range. Consequently, the defendant's claim that his sentence for conspiracy was excessive is denied.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed.


_____

JOHN EVERETT WILLIAMS, JUDGE